2024 IL App (1st) 240725-U

No. 1-24-0725B

Order filed June 25, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| | ) | |
| v. | ) | No. 23 CR 0374601 |
| | ) | |
| DELLTON CHATTMAN, | ) | Honorable |
| | ) | Jennifer Frances Coleman, |
| Defendant-Appellant. | ) | Judge Presiding |
| | ) | |

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgement.

**ORDER**

¶ 1    *Held*: Affirmed. State proved by clear and convincing evidence all elements necessary for denial of pretrial release.

¶ 2    Defendant Dellton Chattman was detained in March 2023 on charges of first-degree murder and home invasion. After the passage of the law eliminating cash bond and allowing previously-detained inmates to seek pretrial release again, known as the Pretrial Fairness Act or "PFA," defendant sought a new hearing, and the State petitioned for his continued detention. The

trial court ordered him to remain in pretrial detention. Defendant now appeals that ruling. We find no error and affirm.

¶ 3    Defendant is charged with the first-degree murder of "Victim," during a home invasion at the residence of "Witness 1." (The names of the victims and witnesses were not disclosed at the detention hearing.) Defendant has been in custody since his arrest on March 3, 2023. He filed a petition for pretrial release on March 11, 2024. The State filed a petition to deny release on March 21, 2024. A bond hearing was held that same day. The State proffered the following information.

¶ 4    Victim was murdered on February 10, 2023, around 10:23 in the morning. At the time, he was in the bedroom in Witness 1's apartment on the ground floor of a building on South Colfax Avenue in Chicago, between 74th and 75th Streets.

¶ 5    Defendant and Witness 1 knew each other for about ten years, having met in a shelter they used to reside in. They were in a romantic relationship for a time, but that ended about two years before the shooting. Witness 1 then starting dating Victim. They were still dating at the time of the shooting.

¶ 6    About two months earlier, in December 2022, defendant and Witness 1 reconnected through the Snapchat app. They met at Witness 1's apartment, without Victim, about two weeks before the shooting. Witness 1 recalled that defendant drove a small black car. A few days before the shooting, Witness 1 blocked defendant on Snapchat. The day before the shooting, defendant sent Witness 1 a request to unblock him. Victim saw that request on Witness 1's phone, and a verbal argument of some sort followed.

¶ 7    The State initially proffered that Victim called defendant on Witness 1's phone, and an argument ensued in which defendant threatened Victim. But when the judge sought clarification

of the details, the State said that there was no argument between defendant and Victim, but rather an argument between Victim and Witness 1.

¶ 8      In any event, Witness 1 left to work the night shift and came home the next morning. The State and the defense, relying on the incomplete discovery available at the time of the hearing, proffered slightly different versions of the events that immediately followed. According to the State, Witness 1 heard a knock on the rear door shortly after she came home and figured it was her roommate. When she opened the door, she saw defendant, dressed in all black, standing in front of her. He forced his way past her and into the building. On the defense version, as Witness 1 was coming inside, a man dressed in all black forced his way into the building, coming up from behind Witness 1, who therefore never saw him head-on.

¶ 9      Either way, the proffer established this much. The intruder was dressed in all black, from head to toe, including a black ski (or other face) mask and skull cap. The man demanded to know where Victim was, thus allowing Witness 1 to hear his voice. And Witness 1 positively identified defendant as the intruder.

¶ 10      Witness 1 tried to block defendant and succeeded, at first, in pushing him back out of the apartment. But defendant then pulled out a handgun, fired a shot, and continued on his way. He proceeded directly to Witness 1's bedroom, apparently knowing where it was, where he found Victim. After trying to force the bedroom door open, defendant reached his arm around the partially open door, fired several shots into the room, and quickly fled the scene. Police recovered four shell casings from the bedroom. Victim died of multiple gunshot wounds.

¶ 11      Witness 2 lived in an apartment building across the gangway from Witness 1. She heard gunshots coming from Witness 1's building, somewhere toward the back. A slim, dark skinned

man, with a complexion like her own, and dressed in all black, ran through the gangway and turned left on Colfax.

¶ 12    A video from a nearby building, about half a block north on Colfax, shows a black Nissan parking on the street. Someone exits from the passenger side and runs back to the car about two minutes later. The car heads northbound on Colfax, and then westbound on 74th Street.

¶ 13    A black, four-door Nissan with Illinois plates is registered in defendant's name. At 10:16 a.m., just a few minutes before the shooting, POD cameras and plate readers recorded a black Nissan turning from East 75th Street onto Colfax Avenue, heading southbound. The first five digits of the license plate were captured by the plate reader. They matched the first five digits on defendant's black Nissan.

¶ 14    Defendant's car was found at or near the home of one of his sisters on the far south side. Cell-site data for defendant's phone appeared to show the phone tracing a path from Victim's building to defendant's sister's house at the relevant time. A few days later, defendant's phone pinged a tower in Gary, Indiana, near the home of his other sister.

¶ 15    On the day of the shooting, Witness 1 "snapped" defendant a message on Snapchat that read, "you shot me."

¶ 16    A security camera showed defendant's car at a McDonald's drive-through about an hour before the murder. Witness 1 viewed a still photo and said that the person visible in the car was not defendant. There was no indication whether that person was the driver or whether anyone else was in the car.

¶ 17    In mitigation, defendant noted that he turned himself in, without incident, after he learned there was a warrant for his arrest. He had no criminal record of any kind, was steadily employed at the YMCA, and was his daughter's primary caretaker. Twenty-five letters submitted to the

court attested to defendant's character, his kind ways, and the exceptional level of responsibility he was known to assume for his family members and others in his community.

¶ 18    Defendant challenged the State's proof of all three findings that are required for pretrial detention. First, he argued that the proof was not evident that he committed the murder or home invasion. It was unclear how Witness 1 could have identified him, when the intruder was clad in black, from head to toe, and came up behind her, so that she never saw the intruder face to face. The surveillance evidence, from various sources, may have put his *car* at the scene of the shooting, but it did not put *him* there, since there was no dispute that someone else was using his car shortly before the shooting. And the cell-site data may have put him *near* the scene, but it was too early to be any more precise than that.

¶ 19     As for dangerousness, defendant emphasized that Witness 1 made several attempts to contact him in custody, according to her own family, thus indicating that she perceived no threat to her safety. And he argued that home confinement, with electronic monitoring, was sufficient to mitigate any perceived dangerousness and ensure his appearance in court. Defendant reiterates these same arguments on appeal.

¶ 20    The trial court ordered defendant to remain in custody. The court found, without further elaboration, clear and convincing evidence that the proof is evident or the presumption great that defendant committed first-degree murder. In the trial court's view, defendant posed a threat to Witness 1, because she was both a surviving eyewitness and possibly an intended victim of the shooting. And the court found that no set of release conditions would suffice, for a combination of three related reasons. Defendant "planned" this shooting. Defendant committed it out of "anger" toward his ex-girlfriend and her romantic interest. And this was "a largely domestic

case," which meant that confining defendant to a particular home would not necessarily prevent him from causing harm in another "domestic situation."

¶ 21    Defendant filed a notice of appeal in the trial court on March 25, 2024, and in this court on April 3, 2024. This appeal was thus initiated before the recent changes to our supreme court rule governing PFA appeals, using the detailed notice-of-appeal form applicable at that time. Both parties filed memoranda in support of their respective positions.

¶ 22    Under the PFA, Defendants are presumed eligible for pretrial release. 725 ILCS 5/110-2(a) (West 2022); *id.* § 110-6.1(e). The State may detain an accused only if it establishes that the charged offense is eligible for detention and proves that (1) the proof is evident or the presumption great that the defendant committed that detention-eligible offense; (2) the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, or the defendant poses a threat of willful flight; and (3) no condition or combination of conditions can mitigate that real and present threat or flight risk. *Id.* § 110-6.1(e).

¶ 23    The State must prove each of these three facts by clear and convincing evidence. *Id.* Clear and convincing evidence is "that quantum of proof that leaves no reasonable doubt in the mind of the factfinder about the truth of the proposition in question." *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 12. If the State fails to carry its burden on any of these three facts, the presumption of release remains, and detention is unlawful. 725 ILCS 5/110-6.1(e) (West 2022).

¶ 24    Our standard of review is unsettled. The author of this opinion is of the belief that detention orders should be subject to independent *de novo* review, with findings of historical fact reviewed for manifest error. See *People v. Whitaker*, 2024 IL App (1st) 232009, ¶ 80 (Ellis, J., specially concurring); *People v. Saucedo*, 2024 IL App (1st) 232020, ¶ 67 (Ellis, J., specially

concurring). The other panel justices believe that the first two factual findings—those of proof-evident and dangerousness or flight risk—should be reviewed for manifest error, while the third factual finding regarding conditions should be reviewed for an abuse of discretion. See *Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-36 (majority opinion); *People v. Parker*, 2024 IL App (1st) 232164, ¶¶ 44-50.

¶ 25    We need not resolve the standard of review here, however, as our decision would be the same under any standard of review.

¶ 26    There is no dispute that defendant is charged with two detainable offenses, first-degree murder and home invasion. Regarding the first prong of evident proof, we find that the State met its burden as to both offenses. Witness 1 positively identified defendant as the intruder who shot Victim. We are not persuaded by defendant's argument that Witness 1 could not identify him under these circumstances. Witness 1 knew defendant for several years, for some time intimately. The fact that he was clad in black, from head to toe, with his face covered, may make it impossible for strangers to identify him, or for anyone to identify him in a video or a photograph. But someone who knew him well, indeed intimately, might still recognize him from other cues such as his shape, his gestures, or how he carried himself. And most importantly, the proffer included evidence that the intruder demanded to know where Victim was. Witness 1 could thus identify defendant's voice, no matter how he may have been dressed.

¶ 27    The surveillance evidence placed defendant's car on Witness 1's block at the time of the shooting. Someone got out, on the passenger side, and came running back two minutes later before the car took off. That person is, no doubt, the likely shooter. True, someone else was seen in defendant's car about an hour earlier, getting some food at McDonald's. But that hardly shows that defendant was not in his car when it arrived on Witness 1's block. And in all probability, the

likely shooter was not alone in the car, given that he used a passenger's side door. What's more, the car was found at or in the immediate vicinity of defendant's sister's house, and defendant's cell phone pinged off of towers that traced a path from Victim's building to that house.

¶ 28    These are only allegations at this point, of course, and nothing here should be construed as negating the presumption of innocence at trial and the State's burden of proving the requisite elements beyond a reasonable doubt. But for our purposes here, there is clear and convincing evidence that defendant committed the charged offenses.

¶ 29    We recognize that defendant has no criminal history, was meaningfully employed, has significant familial responsibilities, and appears to be deeply rooted in his community. These facts all bear on the related (though distinct) questions of whether he poses a danger to the community or specific individuals, and whether release conditions could adequately mitigate any such threat and ensure his continued appearance in court. But notwithstanding these valid points on defendant's side of the ledger, we ultimately agree with the trial court's conclusion that the potential threat to Witness 1 was a sufficient basis for continued detention at this time.

¶ 30    This was both a premeditated killing and a crime of passion. Take the latter point first. It is hardly unheard of for crimes of passion to be committed by otherwise peaceful, law-abiding people, as defendant admittedly appears to be. But here, he stands accused of murdering the lover of an ex-girlfriend who had recently rejected his apparent attempts to get back together with her. And while this may have been a crime of passion, it was not committed in the *heat* of passion or in the heat of the moment. To the contrary, it was a premediated act of violence in which defendant armed himself with a gun and took obvious measures to disguise his identity, thus showing that he knew full well what he was about to do after he forced his way into Witness 1's home.

¶ 31    These facts illustrate just how far defendant is capable of being driven by the passion that this particular relationship apparently engenders. The trial court properly found that defendant is a threat to the safety of Witness 1.

¶ 32    We likewise agree that there are no set of conditions that could mitigate this threat. The fact that Witness 1 has tried to contact defendant while he is *in custody* hardly shows that she sees him as non-threatening. (For whatever weight Witness 1's own assessment might be worth). We share the trial court's concern that home confinement, with electronic monitoring, may not be sufficient to restrain someone who has already been driven to such violent extremes by underlying motivations like these. The danger appears too great to be remedied by any conditions short of detention.

¶ 33    For these reasons, the judgment of the circuit court is affirmed.

¶ 34    Affirmed.